UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR06-00391 RMT |
| Plaintiff, | ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE |
| vs. | |
| STEVEN ERIK PROWLER, | |
| Defendants. | |

This matter has come before the court on the motion by Defendant Steven Erik Prowler ("Defendant") to suppress evidence. A hearing on Defendant's motion was held on January 29, 2007 at which time this court orally granted the motion. The court issues this written order to ensure the record reflects the basis on which Defendant's motion to suppress evidence was granted.

On May 19, 2006, Defendant Steven Erik Prowler (the "Defendant") was charged with traveling in foreign commerce and engaging in illicit sexual conduct with a person under eighteen, in violation of 18 U.S.C. § 2423 (c).[1] On October 16, 2006, Defendant filed a motion to suppress his May 11, 2005 statements to the Royal Thai Police ("RTP") and Immigration and Custom Enforcement ("ICE") agents. Defendant's Motion to Suppress

---

[1] A First Superseding Indictment was filed on November 21, 2006 adding Counts 5 through 9 under the same statute for engaging in illicit sexual conduct with four different minors, and adding Count 10 for knowingly traveling in foreign commerce for the purpose of engaging in illicit sexual conduct under 18 U.S.C. § 2423 (b).

Evidence ("Def's Mot.") at 3.  According to Defendant, the statements should be suppressed because the officers interrogating Defendant engaged in a two-step interrogation to undermine the effectiveness of *Miranda*. *Id.*

On January 29, 2007, the court conducted an evidentiary hearing on Defendant's Motion.  Senior Special Agent Taekuk Cho ("Agent Cho"), with the Immigration and Customs Enforcement Attache Office in Bangkok, Thailand, testified during the evidentiary hearing.

The court, having considered the pleadings, record, testimony during the evidentiary hearing, and other papers filed in this matter, finds as follows:

**Factual Findings**

On May 10, 2005, at approximately 12:30 a.m., the Royal Thai Police ("RTP") received a call from an anonymous male source.  Report of Investigation ("ROI") No. 5, at 1, attached as Exhibit ("Exh.") A to Def's Mot.  The source stated that he had witnessed a male foreigner bringing Thai male minors into an apartment and that he believed the minors were being molested.  *Id.*

At approximately 2:00 a.m., RTP officers conducted surveillance of what turned out to be Defendant's apartment.  *Id.*  During the surveillance, the officers observed two naked male minors hugging and kissing the Defendant, who was also naked.  *Id.*

At 3:00 a.m., RTP officers observed the two boys leaving the apartment and proceeded to interview them.  *Id.*  The minors identified themselves as "Jack" and "Boen," ages sixteen and fifteen respectively, and stated that the Defendant's name was "Steven" and that "Steven" had paid them 500 baht (approximately $15.00) to provide him with sexual gratification.  *Id.*

At approximately 3:20 a.m., RTP officers entered Defendant's apartment after knocking.  Def's Mot. at 3; ROI No. 1 at 2, attached as Exhibit D to Gov's Opp'n (" ROI No. 1").  Upon questioning by RTP, Defendant admitted paying the two minors for allowing the Defendant to take naked pictures of them and have oral sex with them.  ROI No. 5, at 2.

At 3:50 a.m. RTP informed ICE Investigator Promkesa ("Inv. Promkesa") of the office

1  of the ICE Attache in Bangkok, that the RTP had arrested an American citizen identified as
2  Steven Prowler, who had allegedly engaged in illegal sexual activities with Thai male minors.
3  *Id.*  Inv. Promkesa is a Thai foreign service national employed by the U.S. Embassy.
4  Declaration of SSA Taekuk Cho ("Cho Decl.") ¶5, attached to Gov's Opp'n.  Agent Cho
5  testified that he did not know how the RTP had been able to contact Inv. Promkesa, since
6  Promkesa was not at the ICE office that late at night.  Agent Cho testified that Inv. Promkesa
7  had subsequently called Agent Cho on his cell phone to inform him of the information
8  obtained from RTP.
9       At approximately 5:20 a.m. Agent Cho, Inv. Promkesa and ICE attache Gary Kiernan
10 ("Kiernan"), met with RTP at Defendant's apartment.  ROI No. 5, at 1.  Agent Cho testified
11 that because the RTP could not read or speak English, RTP asked ICE agents to assist in
12 looking for evidence.  Agent Cho, Inv. Promkesa and Kiernan then assisted the RTP in the
13 ongoing search of Defendant's apartment.  ROI No. 5, at 2.  The search revealed numerous
14 photographs of naked males ranging in age from fourteen to sixteen years of age, hand
15 written journals describing sexual encounters with minor males in Thailand and other
16 countries, and a collection of pubic hair.  Compl. Aff.  ¶1 and 11.  Agent Cho testified that he
17 had also seen Defendant's e-mail correspondence during the search.  After arresting
18 Defendant,  RTP transported him to the Huamark Police Station in Bangkok.
19      At approximately 8:00 a.m., Agent Cho contacted and spoke to Thomas F. Kasper
20 ("Kasper"), a Special Agent with the Department of Homeland Security in the Los Angeles
21 office.  Compl. Aff. ¶ 6.  Agent Kasper then ran several database searches concerning
22 biographical information about Defendant.  *Id.*
23      Agent Cho testified that on May 10, 2005, RTP allowed Agent Cho and Kiernan to
24 question Defendant in an office within the Huamark Police Station.  According to Agent Cho,
25 the room seemed to be the office of an RTP ranking official.  RTP brought Defendant to the
26 room.  At approximately 1:37 p.m. Agent Cho and Kiernan began questioning Defendant.  At
27 approximately 1:55 p.m., after obtaining Defendant's biographical information, Agent Cho
28 advised Defendant of his *Miranda* rights by having him read a preprinted form.  Compl. Aff. ¶

9e.[2]  Agent Cho and Kiernan proceeded to interrogate Defendant and "specifically requested that [Defendant] detail the activities that occurred early in the morning of his arrest.  ROI No. 1, at 1.  The interrogation lasted until 3:49 p.m. *Id.*, at 2.  Agent Cho testified that during the interrogation, the RTP ranking official in whose office the interrogation was being conducted, walked in and out of his office.

      On May 11, 2005, Kasper conducted database searches regarding Defendant's travel history, revealing Defendant's frequent travels between Asia and Los Angeles.  Compl. Aff. ¶8.

      Agent Cho testified that on May 11, 2005, Inv. Promkesa and Agent Cho returned to the police station to continue interviewing Defendant.  According to Agent Cho, upon their return, RTP asked Inv. Promkesa to translate during an interrogation of Defendant.  As the ranking officer, Agent Cho testified that he entered the interviewing room to make sure everything went well.  He also testified that the interrogation room, while still inside the Huamark Police Station, was different from the room used the day before.  Agent Cho described the room as 8 feet by 10 feet, with a 5 by 2-foot table in the middle. According to Agent Cho, there were only four people in the room:  Captain Prudtipong Promtem ("Captain Promtem") from RTP, Agent Cho, Inv. Promkesa and the Defendant.[3]  At approximately 11:00 a.m., RTP began questioning Defendant.[4]  The interrogation "was conducted in the Thai and English languages."  ROI No. 2, at 1.  Captain Promtem conducted the interrogation in Thai and Inv. Promkesa interpreted in English. *Id.* The ICE Agents assert that Defendant was not advised of his rights under *Miranda* at this time because the ICE agents were "[c]ognizant of the fact that the interview was being conducted by the RTP."  ROI No. 2 at 1.

---

    [2]  Customs Form 4612, attached as Exh. A to Gov's Opp'n.

    [3]  Upon the court's request, Agent Cho drew a chart depicting the interrogation room.  The chart identified only four people seated around the table.  Evidentiary hearing exhibit marked as Exh. 109 for identification purposes.

    [4]  ROI No. 2 at 1., attached as Exh. E to Gov's Opp'n.

1  Agent Cho testified that although he took over two pages of notes concerning the statements
2  made by Defendant during this interrogation, neither Agent Cho nor Inv. Promkesa asked any
3  questions at that time, nor did RTP ask any questions of Defendant on behalf of the ICE
4  agents.  According to Agent Cho, he took notes to corroborate what Defendant had said
5  during the interrogation in the event that Inv. Promkesa was asked later to testify by RTP,
6  since RTP was neither taking notes nor taping the interview.  The interrogation elicited
7  information concerning the night in question and Defendant's ongoing relationship with the
8  minors. Cho's Notes attached as Exh. A to Def's Reply to Gov's Opp'n. (hereinafter referred
9  to as "Cho's Notes").
10         Subsequent to the interrogation conducted in the Thai and English languages ("first
11 May 11 interrogation"), Agent Cho and Inv. Promkesa began another interrogation ("second
12 May 11 interrogation").  Cho Decl., ¶ 8.  At approximately 1:07 p.m., at the beginning of the
13 second May 11 interrogation, Agent Cho advised Defendant of his rights under *Miranda*
14 through a preprinted form.  Cho Decl., ¶ 9. After obtaining Defendant's signature on the form,
15 Agent Cho and Inv. Promkesa continued to elicit information from Defendant.  Compl. Aff., ¶
16 13b.
17         Defendant seeks to exclude the statements given by Defendant during the two
18 interrogations that took place on May 11, 2005.  Def's Mot. at 3.  Defendant argues that
19 because there was a joint venture between ICE agents and RTP by the time the first May 11
20 interrogation took place, the constitutional protections afforded by Miranda applied to such
21 interrogation.  Def's Mot. at 6.  Defendant further argues that the Miranda warning and waiver
22 from May 10, 2005 did not constitute a waiver extending to the first May 11 interrogation.
23 Def's Reply at 4.  Finally, Defendant argues that the statements given by Defendant during
24 the second May 11 interrogation should be excluded as the result of an invalid midstream
25 *Miranda* warning during a "deliberate two-step interrogation." Def's Mot. at 5.
26 **A.  *Joint Venture***
27         In general, the exclusionary rule does not apply to interrogations performed by foreign
28 officials on foreign ground.  *United States v. Covington*, 783 F.2d 1052, 1056 (9th Cir. 1986).

However, a confession obtained without a *Miranda* warning by foreign officials acting in a foreign country must be suppressed if a court finds there was a joint venture between the U.S. and foreign authorities. *United States. v. Emery*, 591 F.2d 1266, 1267-68 (9th Cir. 1978). ("The constitutional safeguard of *Miranda* should not be circumvented merely because [an] interrogation was conducted by foreign officials in a foreign county." ); *Pfeifer v. U. S. Bureau of Prisons*, 615 F.2d 873, 877 (9th Cir. 1980). A joint venture exists when U.S. agents substantially participate in the activities of foreign officials through which the challenged evidence was obtained. *Pfeifer*, 615 F.2d at 877. Whether an interrogation is a joint venture is a question of fact to be resolved in each case. *Covington*, 783 F.2d at 1056. In determining the presence of a joint venture, "the court must closely scrutinize the attendant facts." *United States. v. Rose*, 570 F.2d 1358, 1362 (9th Cir. 1978).

    In this case, there is enough evidence indicating that U. S. agents substantially participated in the activities that led to the statement given by Defendant during the first May 11, 2005 interrogation. As Defendant points out, the interrogation took place after RTP contacted ICE regarding the investigation of Defendant. ROI No. 5, at 1. Within hours of being notified of the investigation, Agent Cho, Inv. Promkesa and other ICE agents arrived at Defendant's apartment while Defendant was still present. ROI No. 5, at 1, Prowler Decl. ¶3. Furthermore, Agent Cho and Inv. Promkesa proceeded to "assist" RTP in the collection of the evidence in Defendant's presence. ROI No. 5, at 2. Although the record shows that at least two of the ICE agents who participated in the search, Inv. Promkesa and Agent Cho, were present during the first May 11 interrogation, the only RTP agent identified as participating in the interrogation is RTP Captain Prudtipong Promtem. ROI No. 2; Cho's Notes at 1. ICE agents actually outnumbered RTP agents during this interrogation. While Agent Cho states that Inv. Promkesa "merely served as an interpreter for Mr. Prowler," Cho Decl. ¶7, and that neither Agent Cho nor Inv. Promkesa asked any questions, *Id.* ¶6, Agent Cho himself took copious and detailed notes during the interrogation. Cho's Notes. Agent Cho testified that he had taken notes during the first May 11 interrogation to corroborate Defendants statements since the RTP was neither taking notes nor taping the proceedings.

The government argues that there was no joint venture between the RTP and ICE agents because RTP had arrested Defendant under Thai law before the ICE agents themselves reached Defendant's apartment. Gov's Opp'n. at 8. While there may not have been enough substantial participation by ICE agents when they arrived at Defendant's apartment, their subsequent actions increased ICE agents' participation in the events that led to Defendant's statement. Subsequent to their arrival at Defendant's apartment, ICE agents assisted in the search of Defendant's apartment, ROI No. 5 at 2, sat in the interrogation, ROI No. 2 at 1, translated the interrogation from Thai into English, Cho's Decl. ¶7, and took copious notes of the interrogation. Cho's Notes.

The government cites to *United States v. Trenary*, 473 f.2d 680 (9th Cir. 1973) for the proposition that *Miranda* warnings are not necessary when a U.S. officer merely acts as an interpreter during the questioning of a defendant by foreign officers. Gov's Opp'n. at 9. As described above, however, there was considerably more participation by U.S. agents in the events that led to the statements from Defendant than merely translating Defendant's statements.

The court finds that the participation of U.S. agents in the events that led to Defendant's statements in the first May 11 interrogation was substantial. Thus, the court finds that there was a joint venture between the U.S. agents and the RTP by the time the first May interrogation took place. Because there was a joint venture, Defendant was entitled to the constitutional safeguard of *Miranda*.

***B. Effectiveness of May 10, 2005 Miranda Waiver***

The Defense argues that the *Miranda* warning given to Defendant on the early morning of May 10 was not fully effective by the time Defendant was again interrogated in the afternoon of May 11, 2005. Def's Reply at 4. The Defense points out that the first May 11 interrogation took place almost 21 hours after Defendant was given the first *Miranda* warning on the early morning of May 10, 2005. *Id.* at 5. In addition to the passage of time, the Defense argues that significant interruptions in the continuity of the interrogation, the different agents present and leading the interrogation, and the different information elicited in the

interrogation constituted enough changed circumstances that the Defendant could have reasonably believe the previous *Miranda* was no longer fully effective. *Id.* at 5-6.

The Supreme Court has rejected per se rules concerning the circumstance under which a suspect must be re-advised of his rights. *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1128 (9th Cir.) *amended by* 416 F.3d 939 (9th Cir 2005). Instead, courts examine the totality of the circumstances to determine whether a previous *Miranda* warning is effective. *Id.* In examining whether a previous *Miranda* warning is still in effect, "the issue is whether [the suspect] could reasonably believe that the *Miranda*" warning he was given previously was still effective "in light of the changed circumstances." *Id.* at 1129.

The court finds that the totality of the circumstances indicate that Defendant could have reasonably believed that the *Miranda* warning administered to him previously was no longer effective given the changed circumstances. Unlike cases cited by government, the changed circumstances here include more than the passage of time and a change in identity of the questioner. Gov's Opp'n at 11 *citing United States v. Andaverde*, 64 F.3d 1305, 1313 (9th Cir. 1995). Here, Defendant spent 21 hours in a Thai jail between the first *Miranda* warning on May 10 and the first May 11 interrogation.[5] The pressures of confinement that the *Andaverde* court found lacking in an Oregon county jail would be more likely present in a foreign jail because Defendant appears not to speak Thai and thus may have been intimidated or confused by his surroundings. *Id. Cf. Andaverde* at 1313. The *Miranda* warning on May 10 had been given by Agent Cho, in the presence of Kiernan. Cho Decl. ¶2. While Agent Cho was also present at the first May 11 interrogation, Inv. Promkesa and Captain Promtem took the lead in the un-*Mirandized* interrogation that was carried out in two languages, with Captain Promtem speaking Thai and Inv. Promkesa translating into English. ROI No. 2 at 1; Cho Decl. ¶6.

---

[5] Defendant was given a *Miranda* warning at approximately 1:55 p.m. on May 10, 2005. Compl. Aff. ¶9e. The first May 11 interrogation started at approximately 11:00 a.m. on May 11, 2005. ROI No. 2 at 1.

The court finds that Defendant could have reasonably believed that the previously administered *Miranda* warnings were no longer effective. Without the prophylactic advantages of a *Miranda* warning during a custodial interrogation, "*Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief." *Andaverde*, 64 F. 3d at 1310 *citing Oregon v. Elstad*, 470 U.S. 298, 317 (1985).

### C. Second May 11, 2005 interrogation

In a recent opinion, the Supreme Court held that *Miranda* warnings given mid-interrogation, after a suspect gave an unwarned confession, were ineffective, and thus a confession repeated after warnings were given was inadmissible at trial. *Missouri v. Seibert*, 542 U.S. 600 (2004), abrogating *United States v. Orso*, 266 F.3d 1030 (9th Cir. 2001) and *United States v. Esquilin*, 208 F.3d 315 (1st Cir. 2000). However, although five justices agreed the statement was inadmissible, there was no majority opinion. *United States v. Williams* 435 F.3d 1148, 1155 (9th Cir. 2006). In *Williams,* the Ninth Circuit, interpreting *Seibert*, announced a new test to determine when a statement following a midstream *Miranda* warning should be inadmissible. *Id.* at 1157.

Under *Williams*, "a trial court must suppress a postwarning confession obtained during a deliberate two-step interrogation where the midstream *Miranda* warning--in light of the objective facts and circumstances--did not effectively apprise the suspect of his rights." *Id.* If the court finds a deliberate and unremedied two-step interrogation, the court must suppress the postwarning confessions "even if they were given after voluntary unwarned statements." *Id.* at 1161. If the court finds the lack of deliberateness, the postwarning statement is then analyzed under the principles of *Oregon v. Elstad*, 470 U.S. 298 (1985). *Id.*

In *Seibert*, the Supreme Court reviewed a "police protocol for custodial interrogations that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession." *Seibert* 542 U.S. at 604. In *Seibert*, Patrice Seibert's son, Jonathan, died in his sleep. *Id.* Seibert feared charges of neglect because Jonathan, who suffered from cerebral palsy, had bedsores on his body. *Id.* In Seibert's presence, two of her

9

sons and their friends planned to set fire to their mobile home, leaving Jonathan's body behind to conceal the facts surrounding his death. *Id.* To avoid any appearances that Jonathan had been left unattended during the fire, the sons planned to leave Donald Rector, an unrelated mentally ill teenager living with the family, behind inside the mobile home. *Id.* When Seibert's son Darian and his friend set fire to the mobile home, Donald died. *Id.*

Seibert was arrested five days later at 3:00 a.m at the hospital where her son Darian was being treated for burns. *Id.* The arresting officer, Officer Kevin Clinton, had been instructed by Officer Hanrahan not to give *Miranda* warnings to Seibert. *Id.* Once at the station, after she was left alone in an interrogation room for 15 to 20 minutes, Officer Hanrahan questioned Seibert for 30 to 40 minutes without *Miranda* warnings. *Id.* at 605. After Seibert acknowledged that she knew Donald was supposed to die in the fire, she was given a 20-minute coffee and cigarette break. *Id.* After the break, Officer Hanrahan turned on a tape recorder, gave Seibert *Miranda* warnings, obtained a written waiver and resumed the interrogation. *Id.* Officer Hanrahan then confronted Seibert with her prior statements and she expanded on the incriminating statements. *Id.*

Seibert was then charged with first-degree murder and moved to suppress both her prewarning and postwarning statements. *Id.* at 606. At the suppression hearing, Officer Hanrahan testified that he made "a conscious decision to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warning, and then repeat the question until [he gets] the answer that she's already provided once." *Id.*

While five justices agreed with the outcome that the confession post *Miranda* was inadmissible because the midstream warning had not effectively apprised Seibert of her rights, under Justice Kennedy's concurring opinion, a court must first analyze whether the officers engaged in a deliberate two-step interrogation to undermine *Miranda*. *Williams*, 435 F.3d at 1157, *citing Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment). If the court finds a deliberate two-step interrogation, the court must then analyze whether the midstream warning effectively appraised the suspect of her rights under *Miranda*. *Id.*

**1. Assessing Deliberateness**

In order to assess whether the *Miranda* warning was deliberately withheld, a court should consider whether the two-step interrogation was used to undermine the effectiveness of *Miranda*. *Williams* 435 F.3d at 1158. In that analysis, the court should look at both objective and subjective evidence. *Id.*

Objective evidence may include the timing, setting and completeness of the prewarning interrogation, the continuity of the police personnel and the overlapping content of the pre- and postwarning statements. *Id.* In addition, the court should also consider any available subjective evidence, such as the officer's testimony. *Id.* "[B]ecause law enforcement officers generally retain control over the timing of a *Miranda* warning and giving the warning to a custodial suspect imposes only a minimal burden, the officer's deferral of the warning until after a suspect's incriminating response further supports an inference of deliberateness." *Id.* at 1160.

ICE Agent Cho in his report concerning the first May 11 interrogation states that because the ICE agents were "[c]ognizant of the fact that the interview was being conducted by the RTP no *Miranda* rights was given." While Agent Cho's statement could be interpreted as a "good-faith" mistake that there was no joint venture and therefore that *Miranda* did not apply,[6] the objective evidence concerning the interrogations points to the opposite interpretation. As the *Williams* court stated:

> Once . . . an officer has detained a suspect and *subjects him to interrogation* – as was the case in *Seibert* and is the case [in *Williams*] – there is rarely, if ever, a legitimate reason to delay giving a *Miranda* warning until after the suspect has confessed. Instead, the most plausible reason for the delay is an *illegitimate* one, which is the

---

[6] See *Seibert*, 524 U.S. at 615 ("Although the *Elstad* Court expressed no explicit conclusion about either officer's state of mind, it is fair to read *Elstad* as treating the living room conversation as a good-faith *Miranda* mistake.")

11

interrogator's desire to weaken the warning's effectiveness. *Williams*, 435 F.3d at 1160.

Under *Seibert*, the two-step interrogation utilized here was deliberate. The *Seibert* court was concerned with a "police protocol" that engages in a two-step interrogation to induce a confession by first obtaining incriminating statements, then providing a *Miranda* warning and thereafter obtaining the same statements again.[7] Here, Agent Cho relied on a custodial interrogation presumably led by foreign agents carried out in a foreign country, where the suspect was questioned without the benefits of *Miranda* warnings. Agent Cho then provided *Miranda* warnings at the beginning of a subsequent interrogation and further developed some of the incriminating statements obtained in the previous interrogations. Just as in S*eibert*, here, Agent Cho relied in a police protocol based upon a two-step interrogation that led to a further confession.[8] Agent Cho's statement that "[c]ognizant of the fact that the interview was being conducted by the RTP no *Miranda* rights was given," like the statement by the officer in *Seibert*, illustrates Agent Cho's reliance on a police technique he may have thought was a proper method to undermine *Miranda*. The court thus finds that the two-step interrogation technique Agent Cho relied upon here was used in a calculated way to undermine the *Miranda* warning. *Seibert,* 542 U.S. at 622 (Kennedy, J., concurring in the judgment).

**2. Assessing Effectiveness of midstream *Miranda* warning.**

The second part of the two prong test under *Williams* requires that the court determine, "based on objective evidence, whether the midstream warning adequately and effectively apprised the suspect that he had a genuine choice whether to follow up on his

---

[7] "The technique of interrogating in successive, unwarned phases raises a new challenge to *Miranda*. Although we have no statistics on the frequency of this practice, it is not confined to Rolla, Missouri." Seibert, 524 U.S. at 609 (Souter J., plurality opinion).

[8] It is uncertain how similar the statements were since Agent Cho's report of the second May 11 interrogation is thus far not a part of the record.

earlier admissions." *Williams*, 435 F.3d at 1160.  In making that analysis, the court must look at the following factors:

    (1) the completeness and detail of the prewarning interrogation,

    (2) the overlapping content of the two rounds of interrogation,

    (3) the timing and circumstances of both interrogations,

    (4) the continuity of police personnel

    (5) the extent to which the interrogator's questions treated the second round of interrogation as continuous with the first, and

    (6) whether any curative measures were taken.

*Id.* at 1160-61.

In evaluating the curative measures, the Ninth Circuit emphasized that a statement indicating the inadmissibility of the prewarning statements may be particularly useful.  *Id.* at 1161.  Similarly, a break in time and circumstances between the interrogations would allow a suspect "to distinguish the two contexts and appreciate that the interrogation ha[s] taken a new turn."  *Id.* at 1161 (internal citations omitted).

Here, the court finds the warning given to Defendant at the beginning of the second May 11 interrogation was not effective in appraising Defendant that he had a genuine choice whether to follow up on his earlier statements.  The prewarning interrogation revealed in detail the encounter with the minors in the night in question as well as Defendant's ongoing relationship with Jack, one of the minors.  There does not seem to be a long break in time between the first and the second May 11 interrogations.[9]  Both Agent Cho and Inv. Promkesa attended both interrogations.  ROI No. 2; Cho Decl. ¶8.  The warning given to Defendant did not indicate that the statement he made in the first May 11 interrogation could be inadmissible.  The post warning interrogation seems to have been so short as to suggest that it was used merely to clarify some points that had not been obtained before, such as follow

---

[9] In his Declaration, Agent Cho states that the interrogation took place "after the completion of the 5/11/05 interview conducted by the [RTP]."  Cho Decl. ¶8.

13

up questions concerning whether Defendant coerced the minors not to tell anyone about their activities.

The completeness and detail of the prewarning interrogation; the short amount of time between the interrogations; the fact that both interrogations seem to occur almost successively in the same location and with the same officers present but for RTP Captain Promtem; the brevity of the postwarning interrogation indicating that the officers treated the postwarning interrogation as continuous with the first; and the fact that no curative measures beside the *Miranda* warning through a preprinted form were taken, all suggest that the Defendant could reasonably believe that he had no genuine choice whether to follow up on his earlier admissions. The court thus finds that the midstream *Miranda* warning was not effective in appraising Defendant of his rights under *Miranda*.

The court finds that there was a joint venture between ICE agents and the Royal Thai Police by the time the first May 11 interrogation took place. In addition, the court finds that under the totality of the circumstances, the *Miranda* warning given on the morning of May 10, 2005 was no longer in effect by the time the first May 11 interrogation took place.

The court further finds that the ICE officers deliberately engaged in a two-step interrogation because Agent Cho relied on a police technique where foreign agents lead a custodial interrogation in a foreign country in a calculated way not to provide *Miranda*, thus undermining the effectiveness of the subsequent warning. Finally, the court finds that the midstream *Miranda* did not effectively appraise Defendant of his *Miranda* rights.

Accordingly,

IT IS ORDERED that Defendant's Motion to suppress is HEREBY GRANTED, thus Defendant's statements obtained during the first and the second May 11 interrogation are SUPPRESSED.

Dated: February 14, 2007.

*[signature]*
ROBERT M. TAKASUGI
United States District Sr. Judge